**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CRIMINAL ACTION** |
| **v.** | ) | |
| | ) | **No. 08-20039-CM** |
| **DARRELL LAWSON,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**MEMORANDUM AND ORDER**

On March 27, 2008, the government indicted Darrell Lawson on one count of possessing with intent to distribute more than fifty grams of crack cocaine.  This charge is based on evidence found during a July 9, 2007 search of defendant's house.  The case comes before the court on Defendant's Motion to Suppress Evidence (Doc. 20).  Although the court finds that portions of the affidavit supporting the warrant should be removed, there remains sufficient probable cause to justify the search.  As a result, the court denies the motion.

**I.     Factual Background**

On July 9, 2007, deputies from the United States Marshals Service arrived at defendant's house with an arrest warrant.  After a delay, defendant opened his door and the deputies arrested him.  Defendant told the deputies that someone—they assumed it was his girlfriend, Sharon Thomas— was also in the house.  During a sweep of the house, the deputies found Ms. Thomas on the second floor and took her to the first floor.  After removing defendant from the house, the deputies asked Ms. Thomas to consent to a search and sign a consent form.

Ms. Thomas signed the form and told the deputies that they might find drugs in a trunk

upstairs.  Although the trunk was padlocked, Ms. Thomas said the key would be on defendant's key ring.  The key was found on the floor near the door.  After seeing cocaine in the trunk, the deputies stopped searching and called agents from the Drug Enforcement Administration ("DEA").

Officers with the DEA task force responded to the deputies' call.  After hearing a summary of the previous events and having a discussion with Ms. Thomas, an officer, Eric Jones, prepared an affidavit for a search warrant.  A state district court judge signed the search warrant.  Officers then searched defendant's house pursuant to the search warrant and seized evidence related to the present indictment.

Defendant makes several arguments for why the evidence obtained from the search of his house should be suppressed.  First, defendant argues that although Ms. Thomas had general authority to consent to a search of the house, she did not have authority to give consent for officers to search the trunk.  Second, defendant argues that Ms. Thomas's consent was not given freely and voluntarily.  Additionally, defendant contends that at the time of her consent, the deputies unjustifiably seized Ms. Thomas under the Fourth Amendment, which raises the government's burden in showing that her consent was voluntary.  Third, defendant argues that the deputies' protective sweep during the arrest was unnecessary and unlawful.

In response, the government argues that the evidence should not be suppressed.  First, the government argues that the delay before defendant opened the door and the deputies' belief that another person was in the house justified the protective sweep.  Second, under the totality of the circumstances, Ms. Thomas freely and voluntarily consented to a search of the house.  The government contends that the signed consent form supports this argument.  The government also disagrees with defendant's characterization of Ms. Thomas being seized or in custody.  Third, the

government argues that the evidence in question would have been discovered inevitably even without Ms. Thomas's consent.  Fourth, the government argues that the good faith exception applies to the officers' actions and, as a result, the evidence should not be suppressed.

On June 24, 2008, this court held a hearing regarding the present motion.  Three witnesses testified during this hearing: Deputy Matthew Cahill, Deputy Michael Thibault, and DEA Task Force Officer Jones.  Counsel for the government and defendant also offered arguments that relied on and expanded upon the previous filings.

## II.      Analysis

Defendant's arguments are based on a common theme: The evidence should be suppressed because the various actions of law enforcement officers violated defendant's Fourth Amendment rights.  The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."  U.S. Const. amend. IV.  When examining a search or seizure, the central question is whether the actions were reasonable.  *United States v. McCullough*, 457 F.3d 1150, 1163 (10th Cir. 2006) (citing *Illinois v. McArthur*, 531 U.S. 326, 330 (2001); *Texas v. Brown*, 460 U.S. 730, 739 (1983)).  To determine whether the actions presently at issue were reasonable requires specific analysis for each action.

## A.      The Warrant

Although last chronologically, the court begins its analysis with whether the search conducted pursuant to the search warrant obtained by the DEA officers was reasonable.  Defendant's only basis for challenging the reasonableness of this search is that the affidavit supporting the warrant contains information that was unconstitutionally obtained.  If a warrant relies on unconstitutionally-obtained information, this court must determine whether the warrant and affidavit contain sufficient evidence to establish probable cause without considering the tainted information.

*United States v. Sims*, 428 F.3d 945, 954 (10th Cir. 2005) ("An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause. If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid."). To determine whether there remains sufficient evidence to establish probable cause, the court determines what evidence should be removed because it was unconstitutionally obtained.

**B.     Ms. Thomas's Consent to Search the Trunk**

Defendant contends that evidence relating to the contents of the trunk was unconstitutionally obtained and should be removed from the affidavit. Under the Fourth Amendment, a search occurs when public officials intrude upon a privacy expectation that society considers reasonable. *See United States v. Walker*, 474 F.3d 1249, 1252 (10th Cir. 2007) (citing *United States v. Bute*, 43 F.3d 531, 534 n.4 (10th Cir. 1994)). Courts have repeatedly found a reasonable privacy expectation in the contents of locked footlockers or trunks. *E.g., United States v. Andrus*, 483 F.3d 711, 717 (10th Cir. 2007) (quoting *United States v. Block*, 590 F.2d 535, 541 (4th Cir. 1978) for part of the statement: "Objects typically associated with high expectations of privacy include 'mankind's valises, suitcases, footlockers, [and] strong boxes.'"); *United States v. Soto*, 988 F.2d 1548, 1553 (10th Cir. 1993) (noting that footlockers are protected even when aboard a ship, where the privacy expectations are "less significant"). A warrantless search of an area protected by a reasonable privacy expectation is per se unreasonable unless it satisfies the requirements of carefully-defined exceptions. *Brown v. Fisher*, 251 F. App'x 527, 535 (10th Cir. 2007) ("While a search conducted without a warrant is usually per se unreasonable, warrantless searches are permissible under certain well-delineated exceptions."). The exception at issue here, for which the government bears the burden to prove, is consent. *Eidson v. Owens*, 535 F.3d 1139, 1145 (10th Cir. 2008) ("A warrantless

-4-

search of a suspect's premises is unreasonable per se under the Fourth Amendment unless the government shows that the search falls within one of a carefully defined set of exceptions, such as a valid consent.").

Defendant challenges whether Ms. Thomas had the authority to consent to a search of the trunk. Valid consent requires the person granting the consent to either have actual authority or apparent authority over the area to be searched. *Andrus*, 483 F.3d at 716. "A third party has actual authority to consent to a search 'if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes.'" *Id.* (quoting *United States v. Rith*, 164 F.3d 1323, 1329 (10th Cir. 1999)). On the other hand, "a third party has apparent authority to consent to a search when an officer reasonably, even if erroneously, believes the third party possesses authority to consent." *Id.* (citing *Georgia v. Randolph*, 547 U.S. 103 (2006)). To evaluate apparent authority existed, the court objectively considers whether "'the facts available to the officer at the moment . . . warrant a man of reasonable caution [to believe] that the consenting authority had authority over the premises[.]'" *United States v. Cos*, 498 F.3d 1115, 1128 (10th Cir. 2007) (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990)). If the facts available to the officer are ambiguous as to whether the person has authority to consent, the officer "has a duty to investigate further before relying on the consent." *Id.* (citing *United States v. Kimoana*, 383 F.3d 1215, 1222 (10th Cir. 2004)).

Here, the government has made no argument—nor is the court aware of any evidence—that Ms. Thomas had joint access to, or control for most purposes of, the trunk. Accordingly, the court finds that Ms. Thomas lacked actual authority to consent to a search of the trunk. Similarly, the government has made no argument that the deputies were reasonable in their belief that Ms. Thomas had authority to consent to a search of the trunk. The deputies discovered the trunk was locked and

asked Ms. Thomas for the location of the key.  According to Deputy Cahill, she said it would be on

defendant's key chain.  According to Deputy Thibault, she said the "only place she knew" would be

on defendant's key ring.  There is no evidence that the deputies believed Ms. Thomas had her own

key, and therefore joint access to the trunk.  Moreover, the deputies did not find the key where Ms.

Thomas indicated it would be.  Instead, the deputies found the key on the floor near where defendant

had been arrested.  Even if the court were to assume that these facts were ambiguous as to whether

Ms. Thomas had joint access to, or control of, the trunk, the deputies did not further investigate this

issue.  Because the locked trunk was an object "typically associated with high expectations of

privacy," it was unreasonable for the deputies to believe that Ms. Thomas had authority to consent to

its search.  *See Andrus*, 483 F. 3d at 716–17.[1]

      Because this belief was unreasonable, Ms. Thomas lacked even apparent authority to consent

to a search of the trunk.  Lacking authority to consent to this search makes Ms. Thomas's consent

regarding the trunk invalid.  Without a valid consent, the search of the trunk was unreasonable.

Thus, the information obtained as a result of searching the trunk should be removed from the

affidavit for purposes of determining whether probable cause supported the warrant.  This excludes

the statement, "Based upon consent from Thomas, Deputies opened the trunk and observed narcotics

and a handgun sitting inside the trunk."[2]

---

[1]  The court notes that assuming that Ms. Thomas's consent to search the house was valid does not make the deputies' inspection of the contents of the trunk reasonable.  *See Andrus*, 483 F.3d at 717 (quoting *Georgia v. Randolph*, 547 U.S. 103, 112 (2006) for the example, "[W]hen it comes to searching through bureau drawers, there will be instances in which even a person clearly belonging on the premises as an occupant may lack any perceived authority to consent.").

[2]  Determining that opening the trunk based on Ms. Thomas's consent was unlawful does not mandate that the evidence later seized from the trunk should be suppressed.  The seizure occurred during a search pursuant to a warrant and, therefore, would have been discovered inevitably if the search warrant is valid.

**C.      Ms. Thomas's General Consent to Search the House**

Defendant also challenges whether Ms. Thomas's general consent to search the house was voluntary.  While consent can make a warrantless entry and search of a home reasonable, the consent must be voluntary.  *United States v. Wattree*, 544 F. Supp. 2d 1262, 1266–67 (D. Kan. 2008) (citing *United States v. Cruz-Mendez*, 467 F.3d 1260, 1265 (10th Cir. 2006); *United States v. Sims*, 428 F.3d 945, 952 (10th Cir. 2005)).  Whether consent was voluntary is a factual determination based on the totality of the circumstances.  *Id.* (citing *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007).  Courts in this circuit use a two-step evaluation process.  First, the court determines whether the government has proffered "'clear and positive testimony that consent was unequivocal[,] specific and freely given.'"  *Id.* (quoting *Guerero*, 472 F.3d at 789).  Second, the court determines whether the government has proven that the consent was given without implied or express duress or coercion.  *Id.*

Here, the government has met the first requirement.  During the June 24, 2008 hearing, Deputy Cahill testified that: (1) Ms. Thomas signed the consent form after someone read it to her; (2) she was allowed to read it; (3) she did not ask any questions; (4) and appeared to sign the form freely and voluntarily.

Regarding the second requirement, the court is guided by a nonexhaustive list of relevant factors in making this factual determination.  These include: whether the officer advised the person of the right to refuse to consent, "the number of officers present, 'physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and physical and mental condition and capacity of the [person giving consent] within the totality of the circumstances.'"  *United States v. Park-Swallow*, 105 F. Supp. 2d 1211, 1214–15 (D. Kan. 2000) (quoting *United States v. Pena*, 143 F.3d 1363, 1367 (10th Cir. 1998)).  Other "classic telltales" of

involuntary consent are brandishing weapons and aggressive language.  *United States v. Olivares-Campos*, No. 06-3411, 2008 WL 1930073, at *7 (10th Cir. May 2, 2008); *United States v. Lizardo-Figueroa*, No. 06-20021-03-KHV, 2007 WL 201119, at *4 (D. Kan. Jan. 22, 2007) (listing factors: "the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed place; and absence of the members of the public").  On the other hand, the Tenth Circuit also considers a signed consent form to be indicative of a voluntary consent.  *Eidson*, 515 F.3d at 1147.

**1.**      **Ms. Thomas's Detention**

The court also notes that while being detained implies some lack of consent, the Tenth Circuit has made clear that an investigative detention, by itself, is not so coercive as to make the consent of all detained persons involuntary.  *United States v. Olivares-Campos*, No. 06-3411, 2008 WL 1930073, at *7 (10th Cir. May 2, 2008); *United States v. Doyle*, 129 F.3d 1372, 1377 (10th Cir. 1997) ("Consent to search may be voluntary even though the consenting party is being detained at the time consent is given.").  If the detention preceding the consent lacks a legal basis, however, the government's burden to prove the consent was voluntary also requires the government to "'establish a break in the causal connection between the illegality and the evidence thereby obtained.'"  *United States v. Reeves*, 524 F.3d 1161, 1170 (10th Cir. 2008) (quoting *United States v. Melendez-Garcia*, 28 F.3d 1046, 1053 (10th Cir. 1994) and applying it in the context of "an unlawful arrest," but also noting that in the context of a seizure in the home, the differences between an investigatory stop and an arrest are "meaningless because [the requirements of *Payton v. New York*, 445 U.S. 573, 576

(1980)] apply to all seizures." *Reeves*, 524 F.3d at 1166.).

Three nondispositive factors are "especially relevant" in considering whether an illegal seizure taints consent: "1) the temporal proximity between the police illegality and the consent to search; 2) the presence of intervening circumstances; and particularly 3) the purpose and flagrancy of the official misconduct." *See United States v. Pina-Aboite*, 109 F. App'x 227, 237 (10th Cir. 2004) (quoting *Melendez-Garcia*, 28 F.3d at 1054, and applying it in the context of a traffic stop detention). The signing of a consent for a search form, by itself, is insufficient evidence to establish a break in the causal connection analysis. *Reeves*, 524 F.3d at 1165, 1170–71 (holding that "the government has failed to identify anything in the record demonstrating in any way that the taint from the unlawful seizure was purged or attenuated before [defendant] gave consent to search" despite the facts noting that "[defendant] signed a form granting permission to search").

Several of the discussed factors apply to the present facts. Deputy Thibault encountered Ms. Thomas as he and other deputies ascended a staircase with weapons drawn. Deputy Thibault put his hand on her, beginning a process of physically passing her "from marshal to marshal down the stairs." Deputy Cahill testified that Ms. Thomas was wearing "bed clothes"—which Deputy Thibault described as a "white, flimsy, frilly type outfit"—and was walking "gingerly" because of a medical condition related to surgery. Deputy Cahill did not recall whether they gave Ms. Thomas a robe before or after she signed the consent form. The deputies sat Ms. Thomas on a couch in the living room. As she sat there, other deputies continued to sweep the house with weapons drawn. Deputy Thibault testified that Ms. Thomas was not free to leave the house and was effectively detained. During this detention, Ms. Thomas discussed with the deputies the discovery of drug paraphernalia upstairs and signed the consent form.

Although the government argues that Ms. Thomas was not in custody or that her consent was

not the result of any detention, evidence presented during the hearing indicates that the deputies

detained Ms. Thomas.  If this detention was unlawful, then the government's lack of evidence or

argument establishing a break in the causal connection between the detention and the consent

becomes dispositive on the issue of whether the consent was voluntary.

**a.      Classifying Ms. Thomas's Detention**

To determine whether Ms. Thomas's detention was lawful requires this court to classify Ms.

Thomas's detention.  The court notes that there are three types of encounters that a citizen may have

with law enforcement:

> (1) consensual encounters[,] which do not implicate the Fourth Amendment; (2)
> investigative detentions[,] which are Fourth Amendment seizures of limited scope
> and duration and must be supported by a reasonable suspicion of criminal activity;
> and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only
> if supported by probable cause.

*United States v. Brown*, 496 F.3d 1070, 1074 (10th Cir. 2007) (quoting *United States v. Davis*, 94

F.3d 1465, 1467–68 (10th Cir. 1996)).  While neither party identifies it as such, the only form of

encounter at issue here is a protective detention, which is a variation of an investigative detention.  A

protective detention is justified by the same rational upholding a protective sweep.  *United States v.*

*Maddox*, 388 F.3d 1356, 1362 (10th Cir. 2004) ("We hold that [*Maryland v. Buie*, 494 U.S. 325

(1990)] applies to both protective searches and protective detentions because the Court's reasoning

in *Buie* supports treating protective sweeps and protective detentions similarly.").  Accordingly, the

protective detention is subject to the same limitations as the protective sweep.  That is, the protective

detention "must be for officer safety purposes only, based upon a reasonable and articulable

suspicion of potential danger to the arresting officers."  *Id.* at 1367.  The officers must reasonably

take steps to ensure officer safety during and after the arrest, and do "no more than necessary to

protect the officers from harm."  *Id.*  The duration of a protective detention should "'last no longer

-10-

than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.'" *Id.* at 1367–68 (quoting *Buie*, 494 U.S. at 335–36).

**b.    Ms. Thomas's detention was unlawful.**

Here, the deputies' detention of Ms. Thomas exceeds the boundaries established by the Tenth Circuit. Momentarily assuming that the protective detention was justified at its inception, the duration of Ms. Thomas's detention extended well beyond the Tenth Circuit's time limits. It is unclear from the evidence presented during the hearing when Ms. Thomas's detention ended. Task Force Officer Jones testified that when he arrived at the house, Ms. Thomas was the only person other than law enforcement officials at the house. From the beginning of the deputies' encounter with Ms. Thomas, she was "very compliant," wearing bed clothes that were "flimsy" and "frilly," and indicating that she had a physical, medical condition related to surgery. Both of the testifying deputies stated that they did not have any other information that would indicate Ms. Thomas posed a danger to their safety. Based on these facts, the amount of time needed to dispel the suspicion that Ms. Thomas was dangerous was minimal.

The sequence of events surrounding the trunk key also indicates that Ms. Thomas's detention outlasted the time it took to arrest defendant and depart the premises. While detained in the "front area" of the house, Ms. Thomas stated that drugs and a firearm would be in an upstairs trunk. The deputies went upstairs and found the trunk. Seeing that the trunk was locked, the deputies returned to the front area and asked Ms. Thomas for the key. Ms. Thomas said the key was on defendant's key ring. By this point, the deputies already had possession of defendant's key ring because—as Deputy Cahill testified—"it was taken when he was removed from the residence." Thus, after the deputies arrested and removed defendant from the premises, Ms. Thomas remained detained.

**c.      There was no break in the causal connection between the detention and the consent**.

Because Ms. Thomas's detention lasted longer than necessary, it was unlawful under the Fourth Amendment.  The government bears the burden to establish a break in the causal connection between the unlawful detention and Ms. Thomas's consent.  As previously mentioned, the court examines whether there was a break in the causal connection under the identified three nondispositive factors: (1) temporal proximity; (2) intervening circumstances; and (3) purpose and flagrancy of official misconduct.  *See Pina-Aboite*, 109 F. App'x at 237.

Regarding temporal proximity, Ms. Thomas signed the consent form soon after she was detained, but after Deputy Cahill went to his car to obtain the consent form and returned.  Thus, by the time Ms. Thomas consented, her detention was already unlawful.  The government has not presented any evidence that Ms. Thomas took a significant amount of time to "independently consider, weigh, and reflect" on her options.  *See United States v. Carter*, No. 02-40050-01-JAR, 2004 WL 1078142, at *2 (D. Kan. May 12, 2004).

While intervening circumstances can be the development of independent evidence that justifies seeking consent, the independent evidence obtained here—the viewing of drug paraphernalia—occurred simultaneously with the start of Ms. Thomas's detention or just after.  The government has not argued that the viewing of drug paraphernalia was the initial basis for the detention or became an additional basis; the government does not acknowledge that she was detained.   Instead, when Deputy Thibault was asked on cross examination if the observation of drug paraphernalia was "the point in time that the focus of the investigation shifted from one being primarily related to the arrest of [defendant] into a potential narcotics offense," Deputy Thibault responded that the observations "only heightened what [the deputies] already [knew, that defendant] had a supervised release violation testing positive for drug use."  When asked the question, "it was

-12-

your advice to Mr. Cahill of your discovery in the upstairs that precipitated the questioning of Ms. Thomas relating to the presence of narcotics in the house[,]" Deputy Thibault responded, "I'm sure that probably helped."  Thus, it is unclear whether the observations of drug paraphernalia were circumstances that changed the nature of Ms. Thomas's detention.  The government did not meet its burden to show that intervening circumstances separated Ms. Thomas's unlawful detention from her consent.

Regarding the purpose and flagrancy of the official misconduct, there is no evidence that the deputies acted in bad faith, or intended to exploit the unlawful detention to gain Ms. Thomas's consent.  This factor alone, however, does not satisfy the government's burden.

## 2.    Ms. Thomas's consent was involuntary.

Because the government failed to establish a break in the causal connection between Ms. Thomas's detention and her consent, the consent was not voluntary.[3]  Without a valid consent, any search pursuant to that consent is unreasonable.  Thus, any information obtained as a result of searching based on Ms. Thomas's consent should be removed from the affidavit for purposes of determining whether probable cause supported the warrant.  No information in the affidavit, other than the already excised statement—"based upon consent from Thomas, Deputies opened the trunk and observed narcotics and a handgun sitting inside the trunk"—relies directly on Ms. Thomas's consent.

---

[3]    Even if the court were to assume that Ms. Thomas's detention was lawful, her consent would likely remain involuntary.  The evidence indicates that Ms. Thomas consented while she was (1) suffering from a physical, medical ailment requiring surgery; (2) wearing a "flimsy," "frilly" nightgown; (3) and in the presence of several deputies who were searching her house with weapons drawn and had physically removed and passed her to a new location.  This situation correlates with several of the established factors this court considers indicative of an involuntary consent.

The chronology of events related to the protective sweep in the affidavit, however, implicates Ms. Thomas's consent. According to the affidavit, "[w]hile taking [defendant] into custody, Deputies came into contact with Sharon Thomas who came from the upstairs master bedroom." After explaining the basis for defendant's arrest, "Deputy Cahill provided Thomas with a consent to search form and asked if she would allow Deputies to search the residence for narcotics[;] Thomas signed the consent to search form . . . ." The discussion between Thomas and Cahill about where narcotics in the house could be found followed. This included all descriptions of the trunk and the locating of the key to the lock. After all of these events, according to the affidavit, "at that time, Deputies began to clear the residence for additional persons." During the protective sweep, deputies observed drug paraphernalia. Thus, while the court rejects Ms. Thomas's consent as a basis for searching the house, the affidavit indicates that the officers observed drug paraphernalia during a protective sweep.[4]

## D.    The Protective Sweep

A protective sweep is defined as a "quick and limited search of the premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). To conduct a protective sweep requires that the circumstances indicate "'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" *United States v. Hauk*, 412 F.3d 1179, 1185–86 (10th Cir.

---

[4] The court notes that the chronology of events in the affidavit differs from the facts presented during the hearing. Defendant, however, has not argued or established that Task Force Officer Jones drafted these inaccuracies knowingly or with a reckless disregard for the truth. *See Franks v. Delaware*, 438 U.S. 154 (1978). Accordingly, the court considers these discrepancies to be insubstantial mistakes and limits its review to defendant's argument that the protective sweep was unjustified.

-14-

2005) (quoting *Buie*, 494 U.S. at 334).

Here, defendant argues that the deputies had no facts indicating that there was an individual posing a danger to them. Defendant highlights the testimony of the deputies, who stated that they had no reason to suspect Ms. Thomas would pose a danger and gave two alternate reasons for the protective sweep. Deputy Cahill identified defendant's delay and noncompliance in opening the door and his criminal history as the reasons for the protective sweep. Deputy Thibault stated that the general rule, which was followed here, is that whenever the person being arrested says there are other people in the house unaccounted for, there will be a protective sweep.

The court agrees with defendant's argument that neither of these given justifications satisfies the standards for a protective sweep established by the Supreme Court or the Tenth Circuit. Defendant's argument, however, focuses only on the subjective motivations of the deputies. To determine whether a protective sweep was appropriate, this court examines whether there was an objectively reasonable basis under the totality of the circumstances for a protective sweep. *See Hauk*, 412 F.3d at1187 (citing *Wren v. United States*, 517 U.S. 806, 813 (1996) for the statement "the Supreme Court has squarely held that the legality of searches and seizures under the Fourth Amendment depends not on the subjective motivations of the police, but on whether there was an objectively reasonable basis for the search or seizure").

Here, the totality of the circumstances supports an objectively reasonable basis for a protective sweep. First, defendant violated his probation by testing positive for narcotics. Second, defendant had a lengthy criminal history. Third, multiple vehicles were parked in front of the house. Fourth, defendant initially refused to open the door and delayed the deputies' entry into the house. *See Hauk*, 412 F.3d at 1192 ("Mr. Hauk's effort to retreat into his house reinforced the officers' reasonable suspicion that the situation was dangerous. At the very least, forcible resistance by the

-15-

subject of a warrant justifies an officer's suspicion that the arrestee has not given up on crime."). Fifth, during this delay, tensions between defendant and the deputies escalated. Sixth, defendant said there was someone else in the house. This set of facts is sufficient to justify a protective sweep. *See Hauk*, 412 F.3d at 1192 (listing similar factors that when "viewed as a totality" justify a protective sweep).[5]

Because the protective sweep was justified, the search was reasonable and did not violate defendant's Fourth Amendment rights. Consequently, the information obtained as a result of the protective sweep should not be removed from the affidavit. The observations of a "small baggie of suspected cocaine sitting on a handrail, as well as a digital scale [appearing to have cocaine residue on top of it] sitting on top of trash in an open trash can in plain view" are part of the court's determination of whether probable cause supported the warrant.

## III.    Conclusion

Based on the statement regarding the observations of drug paraphernalia during the protective sweep and the other remaining portions of the affidavit, sufficient probable cause existed to support the warrant. The warrant is valid. As a result, the search conducted pursuant to that warrant did not violate defendant's Fourth Amendment rights. Any evidence obtained as a result of that search should not be suppressed.

IT IS THEREFORE ORDERED that Defendant's Motion to Suppress (Doc. 20) is denied.

---

[5] Defendant does not argue that the duration of the protected sweep exceeded constitutional limits, nor will the court second-guess the deputies' decisions regarding the order in which to search the house.

Dated this <u>21st</u> day of July 2008, at Kansas City, Kansas.


s/ Carlos Murguia
CARLOS MURGUIA
United States District Judge
